44 F.3d 1229
 63 USLW 2470, 97 Ed. Law Rep. 70
 UNITED STATES of America, Plaintiff-Appellant,
v.
COMMONWEALTH OF VIRGINIA; George F. Allen, Governor, of the
Commonwealth of Virginia; Virginia Military Institute;
Joseph M. Spivey, III, President of the Virginia Military
Institute Board of Visitors; John Williams Knapp,
Superintendent of Virginia Military Institute; The Board of
Visitors of Virginia Military Institute; VMI Foundation,
Incorporated; VMI Alumni Association; The Virginia State
Council of Higher Education and its Members and Officers;
Thomas N. Downing; Elizabeth P. Hoisington, Brig. Gen.;
Robert Q. Marston; A Courtland Spotts, III, Daniel F.
Flowers; B. Powell Harrison, Jr.; Robert H. Spilman;
Samuel E. Woolwine; James W. Enochs, Jr.; William A.
Hazel; Harvey S. Sadow; Douglas K. Baumgartner; Daniel D.
Cameron; Glen N. Jones; John W. Roberts, Defendants-Appellees,
and
Gordon K. Davies, Defendant.
The National Women's Law Center; American Association of
University Women; American Civil Liberties Union;
California Women's Law Center; Center for Women Policy
Studies; Connecticut Women's Education and Legal Fund;
Equal Rights Advocates; Federally Employed Women, Inc.;
Feminist Majority Foundation; Human Rights Campaign Fund;
Lawyer's Committee for Civil Rights Under Law; National
Association for Girls & Women in Sport; National
Association of Commissions for Women; National Council of
Negro Women; National Education Association; National Gay
and Lesbian Task Force; National Hookup of Black Women;
National Organization for Women; NOW Legal Defense and
Education Fund; National Women's Conference Committee;
National Women's Party; Northwest Women's Law Center;
Trial Lawyers for Public Justice; Women Employed; Women's
Law Project; Women's Legal Defense Fund; YWCA of the
U.S.A.; Mary Baldwin College; Wells College; Saint Mary's
College; Southern Virginia College, Amici Curiae.
UNITED STATES of America, Plaintiff-Appellee,
v.
COMMONWEALTH OF VIRGINIA; George F. Allen, Governor, of the
Commonwealth of Virginia; Virginia Military Institute;
Joseph M. Spivey, III, President of the Virginia Military
Institute Board of Visitors; John Williams Knapp,
Superintendent of Virginia Military Institute; The Board of
Visitors of Virginia Military Institute; VMI Foundation,
Incorporated; VMI Alumni Association; The Virginia State
Council of Higher Education and its Members and Officers;
Thomas N. Downing; Elizabeth P. Hoisington, Brig. Gen.;
Robert Q. Marston; A Courtland Spotts, III, Daniel F.
Flowers; B. Powell Harrison, Jr.; Robert H. Spilman;
Samuel E. Woolwine; James W. Enochs, Jr.; William A.
Hazel; Harvey S. Sadow; Douglas K. Baumgartner; Daniel D.
Cameron; Glen N. Jones; John W. Roberts, Defendants-Appellants,
and
Gordon K. Davies, Defendant.
The National Women's Law Center; American Association of
University Women; American Civil Liberties Union;
California Women's Law Center; Center For Women Policy
Studies; Connecticut Women's Education and Legal Fund;
Equal Rights Advocates; Federally Employed Women, Inc.;
Feminist Majority Foundation; Human Rights Campaign Fund;
Lawyer's Committee for Civil Rights Under Law; National
Association for Girls & Women in Sport; National
Association of Commissions for Women; National Council of
Negro Women; National Education Association; National Gay
and Lesbian Task Force; National Hookup of Black Women;
National Organization for Women; NOW Legal Defense and
Education Fund; National Women's Conference Committee;
National Women's Party; Northwest Women's Law Center;
Trial Lawyers for Public Justice; Women Employed; Women's
Law Project; Women's Legal Defense Fund; YWCA of the
U.S.A.; Mary Baldwin College; Wells College; Saint Mary's
College; Southern Virginia College, Amici Curiae.
 Nos. 94-1667, 94-1712.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 28, 1994.
Decided Jan. 26, 1995.
 
 ARGUED: Jessica Dunsay Silver, U.S. Dept. of Justice, Washington, DC, for appellant. Anne Marie Whittemore, McGuire, Woods, Battle & Boothe, Richmond, VA; William Henry Hurd, Deputy Atty. Gen. of Virginia, Richmond, VA, for appellees. ON BRIEF: Deval L. Patrick, Asst. Atty. Gen., U.S. Dept. of Justice, Washington, DC, for appellant. Robert H. Patterson, Jr., William G. Broaddus, J. William Boland, McGuire, Woods, Battle & Boothe, Richmond, VA; James S. Gilmore, III, Atty. Gen. of Virginia, Richmond, VA; Griffin B. Bell, William A. Clineburg, Jr., King & Spalding, Atlanta, GA, for appellees. Marcia Greenberger, Ellen J. Vargyas, Nat. Women's Law Center, Washington, DC; Robert N. Weiner, Leigh McAfee, Mark Eckenwiler, Stefanie J. Raker, Arnold & Porter, Washington, DC, for Amici Curiae Nat. Women's Law Center, et al. James W. Tredway, III, Christian, Barton, Epps, Brent & Chappell, Richmond, VA, for Amicus Curiae Mary Baldwin College. David M. Lascell, Rebecca A. Kirch, Hallenbeck, Lascell & Pineo, Rochester, NY, for Amici Curiae Wells College, et al.
 Before NIEMEYER, Circuit Judge, PHILLIPS, Senior Circuit Judge, and WARD, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.
 Affirmed and remanded by published opinion. Judge NIEMEYER wrote the opinion, in which Senior Judge WARD joined. Senior Judge PHILLIPS wrote a separate dissenting opinion.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 At issue is the important question of whether a state may sponsor single-gender education without violating the Equal Protection Clause of the Fourteenth Amendment.
 
 
 2
 In United States v. Commonwealth of Virginia, (VMI I), 976 F.2d 890 (4th Cir.1992), we concluded that single-gender education was "pedagogically justifiable," id. at 897, and the United States has acknowledged in this case that state sponsorship of single-gender education, if provided to both genders, is not per se a denial of equal protection. Even though single-gender college education yields benefits to both genders, it nevertheless has the secondary effect of excluding men from the women's college and women from the men's college, an effect that becomes yet more complicated when the programs at the two colleges differ to some degree.
 
 
 3
 We must decide now whether the Commonwealth of Virginia's proposal (1) to continue to provide a single-gender military-type college education for men at the Virginia Military Institute (VMI), (2) to provide, beginning in 1995, a single-gender education with special leadership training for women at Mary Baldwin College, and (3) to continue to provide other forms of college education, including military training, for both men and women at other colleges and universities in the state is constitutionally permissible. After applying a heightened intermediate scrutiny test specially tailored to the circumstances before us and imposing specific performance criteria on the implementation of Virginia's proposal, we affirm the district court's judgment approving the proposal.
 
 
 4
 * VMI, established by the Commonwealth of Virginia in 1839 as a four-year military college, has a current enrollment of approximately 1,300 men. The college has always admitted only males and, through an adversative military-type training, it seeks to graduate them as " 'citizen-soldiers, educated and honorable men who are suited for leadership in civilian life and who can provide military leadership when necessary.' " VMI I, 976 F.2d at 893. In VMI I, we affirmed the district court's factual findings, based on studies in evidence, that such a single-gender education is pedagogically justifiable, both for males and females. We concluded:It is not the maleness, as distinguished from femaleness, that provides justification for the program. It is the homogeneity of gender in the process, regardless of which sex is considered, that has been shown to be related to the essence of the education and training at VMI.
 
 
 5
 Id. at 897.
 
 
 6
 We also affirmed findings of fact that coeducation would destroy aspects of VMI's program which lie near the core of its holistic system and that the admission of women therefore would deny them the very benefit they sought by their admission. The district court found that coeducation would require fundamental changes (1) to the adversative method which pits male against male because that method would not produce the same results when a male is set against a female; (2) to the absence of privacy which was found to be essential to the leveling process; and (3) to physical training, requiring VMI to adopt, as was required at the U.S. military academies, a dual-track program for men and women in order to achieve equality in effect. We concluded that coeducation at VMI would thus
 
 
 7
 deny those women the very opportunity they sought because the unique characteristics of VMI's program would be destroyed by coeducation. The Catch-22 is that women are denied the opportunity when excluded from VMI and cannot be given the opportunity by admitting them, because the change caused by their admission would destroy the opportunity.
 
 
 8
 Id. at 897 (footnote omitted).
 
 
 9
 In view of these findings, we did not direct the Commonwealth of Virginia to change VMI to a coeducational college, but we did find that its failure to offer women comparable benefits constituted a violation of the Equal Protection Clause of the Fourteenth Amendment. We remanded the case to the district court, directing it to require Virginia and the other defendants to formulate, adopt, and oversee the implementation of a remedial plan. In giving Virginia the opportunity to select its course to correct the Fourteenth Amendment violations, we did not suggest any particular remedy, but allowed that Virginia might properly decide to alter the program and admit women to VMI, or establish parallel institutions or parallel programs, or abandon state support, leaving VMI the option to pursue its own policies as a private institution.
 
 
 10
 On remand, Virginia designed a proposal to implement a parallel program at Mary Baldwin College providing women with single-gender education, coupled with special leadership training. Following a trial on the appropriateness of the remedy, the district court approved the plan and directed Virginia "to proceed with all deliberate speed in implementing the Plan and to have the Plan operational for the academic year commencing in the Fall of 1995." United States v. Commonwealth of Virginia, 852 F.Supp. 471, 485 (W.D.Va.1994). The court retained jurisdiction to supervise implementation of the plan and required a status report every six months.
 
 
 11
 The plan approved by the district court provides for Virginia to establish with state funds the Virginia Women's Institute for Leadership (VWIL) as part of the undergraduate program at the otherwise privately funded Mary Baldwin College, a women's liberal arts college founded in 1842 in Staunton, Virginia, about 35 miles from VMI. The plan is the product of a task force, chaired by Dr. James D. Lott, Dean of Mary Baldwin College, which set as its goal the task of designing a program at Mary Baldwin College to produce "citizen-soldiers who are educated and honorable women, prepared for varied work of civil life, qualified to serve in the armed forces, imbued with love of learning, confident in the functions and attitudes of leadership, and possessing a high sense of public service." Because its mission is similar to VMI's mission, VWIL would have its students pursue the same five goals as those pursued at VMI: education, military training, mental and physical discipline, character development, and leadership development. In designing the program at Mary Baldwin College, however, the task force concluded that aspects of VMI's military model, especially the adversative method, would not be effective for women as a group, even though the task force concluded that some women would be suited to and interested in experiencing a "women's VMI." The task force concluded instead that its mission and goals could better be achieved by designing a program which deemphasized the military methods associated with the "rat line," see VMI I, 976 F.2d at 893, utilizing instead a structured environment emphasizing leadership training.
 
 
 12
 In addition to the standard bachelor of arts program offered at Mary Baldwin College, VWIL students would be required to complete, as a "minor," core and elective courses in leadership. A student in the VWIL program would be required to take courses in leadership communications; theories of leadership; ethics, community, and leadership; and a leadership seminar or semester of independent research on a topic relevant to women and leadership. Students would also be required to participate in Saturday seminars sponsored by upperclass students on designated subjects. Outside of the classroom, students would be required to complete a leadership externship during which they would work off campus in the public or private sector for up to one semester and to participate in a speaker series in which each VWIL class would be responsible for bringing outstanding leaders to speak on campus. Finally, all VWIL students would be required to organize and carry out community service projects.
 
 
 13
 While students at VWIL would be required to participate in four years of ROTC and in an ROTC summer camp, VWIL would not be organized under the pervasive military regimen that exists at VMI. Nevertheless, in addition to standard ROTC training, the students would conduct "leadership laboratory activities" which might incorporate aspects of military training, and they would participate in a newly-established Virginia Corps of Cadets, a uniformed military corps comprised of the all-female VWIL, the all-male VMI, and the coeducational Virginia Tech ROTC corps. The Virginia Corps of Cadets would be largely ceremonial.
 
 
 14
 Finally, VWIL students would be required to take and pass eight semesters of physical education, a portion of which would be devoted to health education courses. These programs would include athletics, physical training and a "cooperative confidence building program" to be held twice a week.
 
 
 15
 The VWIL program would be implemented at Mary Baldwin College with its faculty, although VMI faculty would conduct some ROTC training and teach some ROTC courses at Mary Baldwin College. The program would be funded by the Commonwealth of Virginia, providing a per student payment equal to the current annual appropriation paid per cadet at VMI. The program, which task force members expect would have about 25 to 30 students in the first year, would also be given a permanent endowment of $5.46 million. The out-of-pocket expenses for students to attend VWIL is expected to be no greater than those of students attending VMI, and VWIL students would be eligible for the same financial aid programs as are available to VMI cadets.
 
 
 16
 The experts for both sides acknowledge that the proposed VWIL program differs from VMI in methodology since VWIL would not rely on the pervasive military life and adversative methods to achieve its goals. Members of the task force, who are professionals in education, testified that the different approach was selected principally to address the different educational needs of most women. Dr. Heather Anne Wilson, a member of the task force, summarized the thinking, stating that "the VMI model is based on the premise that young men come with [an] inflated sense of self-efficacy that must [be] knocked down and rebuilt.... What [women] need is a system that builds their sense of self-efficacy through meeting challenges, developing self-discipline, meeting rigor and dealing with it, and having successes." Mary Baldwin College, which participated actively in the design of the VWIL program, observed in its amicus brief regarding the differences between the methodology used at VMI and that proposed for VWIL:
 
 
 17
 It would have been possible to design the VWIL program to more closely resemble VMI, with identical physical fitness standards and adversative techniques associated with the rat line. Such a program would have been easier to design and to defend against the arguments raised by the government and its amici. But it would have been a paper program, with no real prospect of successful implementation. [Mary Baldwin College] believes it would be professionally irresponsible to compromise student welfare by designing a program to meet litigation objectives instead of student needs.
 
 
 18
 While the task force did not conduct any scientific survey on demand for the proposed VWIL program, or alternatively for a women's VMI, several members expressed the opinion, based on some field data, that demand would be "significant" for VWIL but not for a women's VMI, and some expressed doubt that enough women would be interested in a women's VMI to make it work.
 
 II
 
 19
 The United States contends that the remedial program offered by the Commonwealth of Virginia does not meet the requirements of the Fourteenth Amendment's Equal Protection Clause. It states that "[the proposed remedy] does not correct the constitutional violation, i.e., the denial to women of VMI's unique educational methodology. As the district court recognized, the program 'differs substantially' from the educational program offered at VMI." At oral argument the United States argued that any parallel program would have to be "identical" in substance and methodology to that of VMI. The United States maintains further that by not offering coeducation at VMI, the Commonwealth of Virginia is relying on false stereotypes and generalizations "that women are not tough enough to succeed in VMI's rigorous, military-style program." As the United States summarized its position:
 
 
 20
 [T]he fact remains that men have [this] special educational opportunity available to them and women do not, and that as a result VMI graduates have been very successful in both public and private careers. This suit was brought on behalf of those women who want to go to VMI precisely because it is such a demanding and challenging school. The remedial plan approved by the district court does nothing for them.
 
 
 21
 The United States urges that we enter an order directing Virginia to admit women to VMI as the only remedy for correcting the past constitutional violation.
 
 III
 
 22
 Equal protection of the law requires that persons similarly circumstanced be treated alike, Reed v. Reed, 404 U.S. 71, 76 (1971), but equal protection does not deny states the power "to treat different classes of persons in different ways." Id. at 75. When the state classifies by defining a group to whom a regulation applies or a benefit is conferred, the classification " 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation....' " Id. at 76 (quoting Royster Guano Co. v. Virginia, 253 U.S. 412, 415 (1920)). In striking down a state statute that preferred males over females as administrators of wills in order to further governmental efficiency, the Court provided the seed for the formulation of a test utilizing an intermediate level of scrutiny for state regulations that classify by gender. While Reed implicitly applied a heightened level of scrutiny, the formulation of this standard came later. As this test has finally been articulated, to withstand this level of scrutiny, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." Orr v. Orr, 440 U.S. 268, 279 (1979) (internal quotations omitted); see also Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982).
 
 
 23
 In Hogan the Court outlined a two-step process that inquires (1) whether the state's objective is "legitimate and important," and (2) whether "the requisite direct, substantial relationship between objective and means is present." Id. at 725. The Court explained that tailoring the means to fit the legitimate and important purpose is necessary to assure that the classification is the product of "reasoned analysis" rather than the "mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women." Id. at 725-26. In Hogan, the Court held unconstitutional Mississippi's women-only admissions policy of a state supported nursing school. In doing so, the Court relied on the first prong of its articulated test, finding that the state's purported objective to "compensate[ ] for [past] discrimination against women," id. at 727, was in effect an effort to " 'protect' members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior." Id. at 725. The state's purported justification, the Court observed, perpetuated an archaic and stereotyped view of women as nurses. Thus, affirmative action in favor of women based on an outdated and unsupported assertion that such protection was needed was held not to be an important governmental objective. Cf. Kirchberg v. Feenstra, 450 U.S. 455 (1981) (holding that a state statute, which preserves the husband as "the head and master of the [marriage] partnership or community of gains" by providing the husband, and not the wife, with the right to unilaterally dispose of jointly held property, was not a legitimate and important state objective). The Court in Hogan did not decide, however, and indeed appears deliberately to have left open, the question of whether states could provide single-gender education in other circumstances. See 458 U.S. at 720 n. 1.
 
 
 24
 In undertaking the first step of the Hogan analysis to determine whether the state's objective is "legitimate and important," a court should not substitute its priorities of value over those established by the democratically chosen branch. To remain true to its constitutional role and avoid the pitfalls of a substantive evaluation of proper governmental objectives, which would amount to a "substantive equal protection analysis," a court should, at this step, deferentially consider only whether the regulation is important to a legitimate governmental purpose. The cautious approach to this first prong of intermediate scrutiny effectively redirects the court's focus on evaluating the state's means for obtaining its objective, which is the second step to the Hogan analysis. Giving greater scrutiny to the selection of means than to the proffered objective recognizes an appropriate deference to legislative will and at the same time assures that the legislature does not accomplish its objectives through an unequal application of the law. The substantive equal protection portion of the analysis cannot, however, be entirely diminished, for the courts can never approve a pernicious legislative purpose or one that does not comport with traditional notions of the proper role of government. The proper relative balance under this "procedural equal protection analysis" thus results in a court scrutinizing closely the procedural mechanism adopted by the legislature to accomplish its purpose and determining whether the means selected fits that purpose and bears a direct and substantial relationship to it. Cf. Faulkner v. Jones, 10 F.3d 226, 230 (4th Cir.1993) ("A regulatory classification which is made for a purpose unrelated to the purpose of the regulation, or which is broader than that appropriate for the regulation, may reveal prejudice and define discrimination.").
 
 
 25
 There is ample support for directing the court's attention from a substantive equal protection analysis to a more procedural analysis. In Craig v. Boren, 429 U.S. 190, 199-200 (1976), the Court recognized, without a significant substantive evaluation, that the protection of public health and safety, which formed the basis for Oklahoma's statutes prohibiting the sale of "3.2% beer" to males under 21 and females under 18, "represents an important function of state and local governments." But the Court found the statute unconstitutional nevertheless because the classification by gender was not shown to serve a sufficient role in achieving the state's objective. Similarly in Reed, the Court agreed, again without any significant substantive evaluation, that establishing an efficient probate process was a legitimate governmental objective. But it nevertheless held that selecting males over females as administrators of wills was not a means that bore a direct and substantial relationship to the state's objective. See 404 U.S. at 76-77. See also Orr v. Orr, 440 U.S. 268, 280 (1979) (readily acknowledging as legitimate the state's purpose of providing assistance to needy spouses but finding unconstitutional the means that required husbands, but not wives, to pay alimony upon divorce).
 
 
 26
 Accordingly, under the intermediate level of scrutiny of a statute or program that classifies by gender, the analysis begins with the limited inquiry into whether the state objective is both consistent with a legitimate governmental role and important in serving that role. Thereafter it must shift to an inquiry of heightened scrutiny into whether the classification "substantially and directly furthers" that objective.
 
 
 27
 Application of this traditional test, however, to a case where the classification is not directed per se at men or women, but at homogeneity of gender, presents a unique problem, because once the state's objective is found to be an important one, the classification by gender is by definition necessary for accomplishing the objective and might thereby bypass any equal protection scrutiny. The second prong of the test thus would provide little or no scrutiny of the effect of a classification directed at homogeneity of gender. Thus, in order to measure the legitimacy of a classification based on homogeneity of gender against the Equal Protection Clause, we conclude that we must take the additional step of carefully weighing the alternatives available to members of each gender denied benefits by the classification.
 
 
 28
 To achieve the equality of treatment demanded by the Equal Protection Clause, the alternatives left available to each gender by a classification based on a homogeneity of gender need not be the same, but they must be substantively comparable so that, in the end, we cannot conclude that the value of the benefits provided by the state to one gender tends, by comparison to the benefits provided to the other, to lessen the dignity, respect, or societal regard of the other gender. We will call this third step an inquiry into the substantive comparability of the mutually exclusive programs provided to men and women.
 
 
 29
 Therefore, in this case we will examine a state-sponsored educational scheme offered by the Commonwealth of Virginia, under which the state provides a single-gender military-type college education to men and a single-gender college education with special leadership training to women, and determine (1) whether the state's objective of providing single-gender education to its citizens may be considered a legitimate and important governmental objective; (2) whether the gender classification adopted is directly and substantially related to that purpose; and (3) whether the resulting mutual exclusion of women and men from each other's institutions leaves open opportunities for those excluded to obtain substantively comparable benefits at their institution or through other means offered by the state. This is the special intermediate scrutiny test that we shall apply in deciding this case.*
 
 IV
 
 30
 Turning to Virginia's proposed VWIL program, we begin with the first part of the test and inquire into whether single-gender education constitutes a legitimate and important governmental objective, remembering that deference is to be accorded the state's legislative will so long as the purpose is not pernicious and does not violate traditional notions of the role of government.
 
 
 31
 The provision of education is considered one of the most important functions of state and local government. See Brown v. Board of Educ., 347 U.S. 483, 493 (1954) ("Today, education is perhaps the most important function of state and local governments."); Stroman v. Colleton County Sch. Dist., 981 F.2d 152, 158 (4th Cir.1992) ("Public education is recognized as one of the most important public services offered by state government."). State and local governments routinely commit large portions of limited tax dollars to education and mandate that, through a certain educational level, attendance at school is legally required. Moreover, discussions of economic competitiveness and the root causes of social disorder commonly end in a discussion about the importance of public education.
 
 
 32
 As important as education is thought to be to the welfare of the people, it is nevertheless not a right secured to the people by the Constitution, see San Antonio School District v. Rodriguez, 411 U.S. 1, 35 (1973), and following from that reality, a citizen does not, in the absence of legislative will, have a right to demand a publicly financed education. Moreover, it is not the province of the courts to create such rights in the name of guaranteeing equal protection of the laws. Id. at 33.
 
 
 33
 When a state chooses to support college education, it need not provide all types of education, all disciplines, all methods, or all courses. A state with limited resources might, for example, subsidize a medical school without similarly subsidizing a law school, and its selection from among many permissible beneficial programs does not in and of itself constitute "unequal protection." When a state narrows the range of its educational offerings, a narrowing of the class of those appropriately benefited is a necessary consequence. But a state may not establish a classification for admission, for example, to a medical school unrelated to its purpose of providing a medical education. Thus, we would expect judicial approval of an admissions classification based on intellectual capability, but not on race or national origin. In a similar vein, if a state were to choose to subsidize a conservatory of music, sponsoring such a benefit might not fall beyond the range of what constitutes a legitimate and important state purpose. Yet those qualified to attend would naturally be a narrowly-drawn class of persons who qualified as the best musicians. Such a classification necessarily excludes most people, yet it is substantially related to the governmental objective. On the other hand, a classification for that conservatory defined by gender would probably not qualify as an appropriate classification.
 
 
 34
 Turning to this case, providing the option of a single-gender college education may be considered a legitimate and important aspect of a public system of higher education. That single-gender education at the college level is beneficial to both sexes is a fact established in this case. See United States v. Commonwealth of Virginia, 766 F.Supp. 1407, 1411-12 (W.D.Va.1991). Indeed, the briefs submitted in this case by the parties and amici curiae list a multitude of professional articles describing the benefits of single-gender education, especially for late adolescents coming out of high school. This should not be surprising in light of common experience that a sex-neutral atmosphere can be less distracting to late adolescents in an educational setting where the focus is properly on matters other than relationships between the sexes. Moreover, it is not surprising that the public, increasingly seeking admission to single-gender colleges, finds this objective to be important. A recent edition of a national magazine, devoted to an annual collection of statistical data and ratings about colleges and universities, reports:
 
 
 35
 After two decades as also-rans in higher education's rush to embrace coeducation, women's colleges are experiencing an unanticipated surge in enrollments and positive public attention.
 
 
 36
 * * * * * *
 
 
 37
 While the disproportionate distinction achieved by women who are alumnae of single-sex institutions ... is partially responsible for the enrollment boom, there are other explanations. Many attribute the newfound popularity to studies showing that girls in adolescence and beyond typically react to coeducational classrooms with "learned silence" and lowered aspirations. Others cite the diminished attraction of coeducation because of worrisome statistics on drinking and concerns about date rape and other violent crimes at institutions with both men and women, as well as the mounting criticism of large universities for seeming indifference to the quality of undergraduate education.
 
 
 38
 "A Burst of Popularity," U.S. News & World Report, Sept. 26, 1994.
 
 
 39
 Just as a state's provision of publicly financed education to its citizens is a legitimate and important governmental objective, so too is a state's opting for single-gender education as one particular pedagogical technique among many. Although there remains some disagreement among the experts about the extent of the benefits of single-gender education, it is not our role to resolve that issue. It is enough that there is a growing consensus in the professional community that a sexually homogeneous environment yields concrete educational benefits. Thus, we should defer to a state's selection of educational techniques when we conclude, as we do here, that the purpose of providing single-gender education is not pernicious and falls within the range of the traditional governmental objective of providing citizens higher education. Accordingly, we conclude that Virginia has met the first part of our intermediate scrutiny test.
 
 V
 
 40
 When applying the special intermediate scrutiny test for classifications based on homogeneity of gender in the context of higher education, we next consider whether that classification is substantially related to the state's purpose. When combined with the third part of the test, i.e., the inquiry into whether excluded men and women have opportunities to obtain substantively comparable benefits, this inquiry scrutinizes the means by which the state chooses to obtain its objective.
 
 
 41
 Single-gender education provides an educational environment in which the student population is of one sex, providing the assumed benefit that those students are not distracted by the presence of the other sex. Even though it may be offered to both genders through separate institutions, separate campuses, or even separate classrooms, a single-gender educational program necessarily excludes members of the gender not included in that institution, campus, or classroom. The importance of the classification is not the fact that the student body is male or female, but that it is of the same gender, whichever is chosen for the particular program. But the only way to realize the benefits of homogeneity of gender is to limit admission to one gender. Thus, the means of classifying by gender are focused on the single-gender educational purpose as directly as the nature of the objective allows.
 
 
 42
 The classification for single-gender education at VMI is also directly related to achieving the results of an adversative method in a military environment. The adversative method was not designed to exclude women, but seized on the possibility, in a sexually homogeneous environment, of grating egos and setting the aggressiveness of one person against another through conflict, egalitarianism, lack of privacy, and stress--both physical and mental. The adversative method is intended to break down individualism and to instill the uniform values espoused by the institution. The methodology described, however, has never been tolerated in a sexually heterogeneous environment; indeed, we condemn it for good reason. If we were to place men and women into the adversative relationship inherent in the VMI program, we would destroy, at least for that period of the adversative training, any sense of decency that still permeates the relationship between the sexes.
 
 
 43
 Accordingly, to preserve the benefits of single-gender education, which Virginia has chosen to attain through separate institutions, the programs at VMI and Mary Baldwin College would of necessity exclude persons of the opposite gender, men at Mary Baldwin College and women at VMI. No more direct means could be adopted to accomplish the state's objective of providing single-gender education at the institutional level. It is inherent in the benefit that men must be excluded from the women's program and women from the men's.
 
 
 44
 While we are satisfied that a classification for homogeneity of gender is necessary to provide single-gender education, at whatever level of separation, we must nevertheless, under the special intermediate scrutiny test that we are applying for such classification, be satisfied that both excluded men and excluded women have reasonable opportunities to obtain benefits substantively comparable to those they are denied. That brings us to the final inquiry of this intermediate scrutiny test.
 
 VI
 
 45
 In determining the substantive comparability of benefits, we are faced with at least two questions: how are the benefits from which one gender is excluded to be defined, and on what level and to what degree must other benefits be comparable.
 
 
 46
 The United States notes that VMI affords a unique type of military training as part of its educational program which cannot be duplicated in another institution. Even though it acknowledges that a parallel program could theoretically satisfy the requirements of the Equal Protection Clause, the United States argues that any such program must be identical to that of VMI. Because that cannot be accomplished, it concludes that women could only enjoy the unique benefits of the VMI program if VMI admits women.
 
 
 47
 The failure of the government's syllogism, however, comes from its failing to follow its logic to completion. If we ordered VMI to admit women, the program would be irrevocably altered, forever denying its unique methodology to both women and men. Changes would have to be made to the adversative method, to the absence of privacy, and to the physical requirements of the program, all of which are part of VMI's unique methodology. Certainly military training could be provided for women at VMI, but it would be substantially different from the training VMI cadets currently receive and would be closer to the programs offered by the U.S. military academies, which are already open to women. Thus, neither gender would experience the unique type of adversative military training now utilized at VMI if VMI were to become coeducational.
 
 
 48
 Moreover, the government's argument that a comparable opportunity requires an identical program is not sustained by the Equal Protection Clause. The advocation that laws require equal methods and equal results for different classes of people can no more be supported than the suggestion that two programs for two different classes of people can ever be identical. See Reed, 404 U.S. at 75; Jenness v. Fortson, 403 U.S. 431, 442 (1971) ("Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike."). And the alternative of allowing a state to provide benefits only when they could be provided in identical form to all of its citizens, regardless of whether they are similarly circumstanced, is justified only by a needless, and indeed baseless, demand for conformity.
 
 
 49
 Thus, if the state desires to offer the benefits of single-gender education to its citizens, the state must mitigate the effects of the resulting gender classification by affording to both genders benefits comparable in substance, but not in form and detail.
 
 
 50
 VMI offers a publicly subsidized college education in a single-gender environment, resulting in a bachelor's degree and intended to produce disciplined men of honor who are well-suited for leadership. Its method involves the use of the traditional classroom in a pervasive military environment. The VWIL program at Mary Baldwin College would likewise intend to provide an educational opportunity in a single-gender environment, leading to a bachelor's degree coupled with discrete training designed specifically to prepare women for leadership. In considering the level of detail for any comparison of the two programs, we must, to achieve a meaningful comparison of substance, do more than simply recognize that both programs provide higher education leading to an undergraduate degree. But we should not reject programs that are aimed at achieving similar results, not generally available from other institutions of higher learning, simply because they differ in approach. In this case, both VMI and VWIL are focused on results beyond simply awarding an undergraduate degree. Both seek to teach discipline and prepare students for leadership. The missions are similar and the goals are the same. The mechanism for achieving the goals differ--VMI utilizing an adversative and pervasive military regimen and VWIL proposing to utilize a structured environment reinforced by some military training and a concentration on leadership development--but the difference is attributable to a professional judgment of how best to provide the same opportunity.
 
 
 51
 To argue whether the adversative and pervasive military method applied to men at VMI should be applied to women at VWIL to reach better the goal of taught discipline and leadership in women makes for a rigorous debate among professional educators. The possibility of adapting the adversative methodology to women, setting woman against woman with the intended purpose of breaking individual spirit and instilling values, could succeed only if it is true that women, subjected to the same grating of mind and body, respond in the same way men do, and only then if a sufficient number of women necessary to make such a program work desired to participate in the program. Educational experts for the Commonwealth testified that women may not respond similarly and that if the state were to establish a women's VMI-type program, the program would attract an insufficient number of participants to make the program work. The United States did not offer sufficient evidence to lead us to conclude that the Commonwealth's expert testimony was clearly erroneous in this regard. But we need not resolve such details of methodology. This is the type of ongoing debate that is to be expected among substantively comparable institutions, and it reveals a vitality of professional concern which can lead to institutional betterment through adjustments down the road. In this case, the mission and goals are the same, and the methodologies for attaining the goals, while different, nevertheless are reasonably calculated to succeed at each institution. Those differences that do exist do not require that the important state purpose of providing single-gender education for both sexes be defeated in this case.
 
 
 52
 It is true that VWIL is at its incipiency, and the VWIL degree from Mary Baldwin College lacks the historical benefit and prestige of a degree from VMI. But such intangible benefits can never be created on command--they must be the byproduct of a longer-term effort. Moreover, to some extent, we compensate for this deficiency in the remedy section, below. For purposes of the Equal Protection Clause, however, we are satisfied that the programs to be offered at both institutions can be substantively comparable if VWIL is undertaken with a persistently high level of commitment by Virginia and that men and women mutually excluded by the two programs will not be denied the opportunity for an undergraduate education with discipline and special training in leadership. It is noteworthy that men and women are not limited to the choices available at these two institutions. Virginia provides a much broader array of opportunities in higher education through other state supported colleges and universities, including the coeducational military program at Virginia Polytechnic Institute and State University. See VMI I, 976 F.2d at 893 n. 1 & 898 n. 8.
 
 
 53
 In this case, we conclude that if the conditions that we impose below are fulfilled, the opportunities that would be open both to men and women are sufficiently comparable. We therefore are satisfied that the special intermediate scrutiny test defined for this case has been met, insofar as a proposed program can meet this test, by the VWIL program proposed at Mary Baldwin College.
 
 VII
 
 54
 Were Virginia now building its higher educational program from the ground up and, as part of it, offering bachelor's programs (1) at a male-only institution featuring a highly disciplined military environment, (2) at a female-only institution featuring a highly disciplined leadership program in a non-military environment, and (3) at a third institution offering a broad array of subjects and methods in a coeducational environment, our analysis would end here with approval of the program against an equal protection challenge.
 
 
 55
 In this case, however, there is an added element created by the presence now of VMI as an ongoing and successful institution with a long history and the absence now of a comparable single-gender women's institution. Virginia's proposal for Mary Baldwin College is just that--a proposal. Virginia has undertaken what appears to be a serious effort at developing a plan to meet this historic deficiency. Virginia appointed a task force of professionals to design a new program, designed a program aimed at special leadership for women, and funded the proposed program at the same per capita levels at which it funds VMI. In addition, governmental officials in Virginia seem to be supporting the new program at every level. In our earlier opinion we noted some ambivalence in that regard. Then-Governor Douglas Wilder had favored coeducation at VMI in the face of no other alternative, and state education officials favored a separate program, or some other course, leading the state, as a party, to bow out of the liability phase of the litigation as a house divided. Governor Wilder is now firmly behind the VWIL program as is current Governor George Allen. Moreover, the Virginia legislature has supported the program by providing what appears to be adequate funding and by promising to increase the level of funding, should the response require it.
 
 
 56
 Nevertheless, a state's response to a court ordered correction of a Fourteenth Amendment violation is given under command and therefore must be viewed with some skepticism. While the court was assured at oral argument that the program proposed at Mary Baldwin College was serious and had the full support of the state, the important question remains whether Virginia will implement the program with the intensity and perseverance necessary to provide a substantively comparable opportunity for women, so that when VWIL is established we will not conclude that the value of the benefits provided by that program, when compared to VMI, tends "to lessen the dignity, respect, or societal regard" of women. To allay any skepticism and assure eradication of the constitutional violation, we therefore find it essential, during the early stage of VWIL's history, to be assured affirmatively that a high level of state support continues.
 
 
 57
 Accordingly, while we affirm the judgment of the district court, which has issued an injunction mandating implementation of the plan and retaining jurisdiction to oversee the implementation, we are remanding the case with instructions that the court include, as part of its oversight of the plan's implementation, a specific review to ensure that (1) the program is headed by a well-qualified, motivated administrator, attracted by a level of compensation suited for the position; (2) the program is well-promoted to potentially qualified candidates; (3) the program includes a commitment for adequate funding by the state for the near term; and (4) the program includes a mechanism for continuing review by qualified professional educators so that its elements may be adjusted as necessary to keep the program aimed not only at providing a quality bachelor's degree but also at affording the additional element of taught discipline and leadership training for women.
 
 
 58
 AFFIRMED AND REMANDED.
 
 PHILLIPS, Senior Circuit Judge, dissenting:
 
 59
 In VMI I, 976 F.2d 890, we held unanimously that the Commonwealth of Virginia's official policy of allowing only men to be educated at state-supported Virginia Military Institute violated the Equal Protection Clause. Specifically, we held, applying intermediate level scrutiny under developed Equal Protection jurisprudence, that if, as the Commonwealth then asserted, the "important governmental objective" its policy served was the provision for its citizens of a diverse array of educational opportunities, including single-gender education, then providing one single-gender institution for men but none for women could not be deemed "substantially related to achievement" of that objective. Id. at 892, 899. Furthermore, we expressed doubt that the asserted diversity-of-educational-opportunities objective could stand scrutiny as the actual reason for maintaining VMI's male-only policy. Id. at 899 (pointing to lack of any state-announced policy of providing single-gender education as part of overall "diversity" goal; to the failure of the Commonwealth to defend the policy in this litigation; and to the fact that the actual policy being overwhelmingly followed by the Commonwealth's colleges and universities was coeducation rather than single-gender education).
 
 
 60
 In any event, whether because the asserted governmental objective of "diversity" was not a credible reason for the policy, or because, if it were, maintaining one male-only institution in the overall system could not be deemed substantially related to such an objective, we held the policy violative of equal protection guarantees. And, in keeping with established judicial policy where comparable forms of systemic state action have been found violative of equal protection, see, e.g., White v. Weiser, 412 U.S. 783, 794-95 (1973) (electoral redistricting), we remanded with directions to allow the Commonwealth to make the first attempt at remedy. VMI I, 976 F.2d at 900. In doing so, we noted the two obvious remedies: admitting women to VMI (going co-ed) or foregoing further state support (going private). Id. Additionally--and I believe prudently, if with risk--we noted the possibility, without pre-judging the validity of any effort to realize it, of establishing "parallel institutions or programs." Id.
 
 
 61
 The Commonwealth opted for the "parallel program" possibility as an attempted remedy and submitted to the district court the proposed plan summarized in the majority opinion. Finding it adequate if properly implemented over time to satisfy equal protection guarantees, the district court adopted it in the form of an injunctive decree that directed compliance "with all deliberate speed." 852 F.Supp. 471, 485 (W.D.Va.1994). The panel majority has now affirmed the district court's decree and the critical findings and conclusions on which it is based.
 
 
 62
 With all respect, I would not do so. I do not believe the proposed remedial plan, whose judicial adoption in unrealized form obviously does not bring Virginia into present compliance with equal protection guarantees, has any real and effectively measurable capacity to do so over foreseeable time.
 
 
 63
 I therefore dissent. I would hold that the proposed remedial plan fails, as did the policy rejected in VMI I, to pass equal protection muster under the appropriate intermediate level of scrutiny. Accordingly, I would reject the plan, declare the VMI men-only policy still in violation of the Equal Protection Clause, and order that the violation be ended either by abandoning the policy or by foregoing further state support for the institution.
 
 
 64
 * Though the legal framework is well known and the general historical background of this litigation is not in dispute, a brief summary is needed to aid in identifying the exact constitutional issue that is now before us.
 
 
 65
 When Virginia Military Institute was founded in 1839 as a state-supported military school for men only, it is inconceivable that any thought was given by the founders to the possibility that women should not be denied its intended benefits. No conscious governmental choice between alternatives therefore dictated the original men-only policy; it simply reflected the unquestioned general understanding of the time about the distinctively different roles in society of men and women. See Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 725 n. 10 (1982) (noting numerous examples from that era of "legislative attempts to exclude women from particular areas simply because legislators believed women were less able than men to perform a particular function"). Since that time and until this litigation (so far as anything before us reveals) no conscious governmental choice had ever been made by the Commonwealth of Virginia to reexamine that original policy. So far as can be told, the gender-role premises of its origins were those that continued over time to sustain it as official state policy.
 
 
 66
 It is clear then that it was this litigation that prompted the Commonwealth's first official re-examination of the policy and its underlying premises in light of the Fourteenth Amendment's requirement that the states provide the equal protection of their laws to all persons subject to them. That obligation, as imposed in 1868, has from earliest times been understood by the courts to expose gender-classifications to equal protection judicial scrutiny. Early on, that scrutiny was almost completely deferential to the legislative prerogative, asking only whether the classification served any reasonably conceivable, legitimate governmental purpose. See, e.g., Bradwell v. Illinois, 83 U.S. (16 Wall), 130, 141 (1872) (standard applied to uphold law prohibiting women from practicing law). Since 1976, however, the Supreme Court, confirming a trend toward some degree of heightened scrutiny that started in the early 1970's, see, e.g., Reed v. Reed, 404 U.S. 71 (1971) (invalidating state law that preferred men over women as administrators of decedents' estates), has interpreted the Clause to require a significantly more stringent standard, "intermediate" between the "strict" scrutiny required for racial and other historically "suspect" classifications, and the most deferential "rational basis" scrutiny originally applied to gender-based classifications. As expressly adopted in Craig v. Boren, 429 U.S. 190 (1976), this intermediate level of scrutiny asks whether the state's gender-classification "serves important governmental objectives" and is "substantially related to achievement of those objectives," id. at 197. Under this standard, states seeking to uphold such classifications "carry the burden of showing an 'exceedingly persuasive justification' for [it]" by demonstrating both that the governmental objectives it asserts for the classification are "important" ones and that "the discriminatory means employed are substantially related to achievement of those objectives." Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982).
 
 
 67
 It was this intermediate level of scrutiny that we applied in VMI I in holding the original male-only policy violative of equal protection. That holding still stands. Unless and until it is overruled, the original policy--which still remains in effect--remains unconstitutional. The district court's decision that we now review does not of course purport to hold otherwise. It assumes, as it must, the continuing unconstitutionality of that policy, but holds that the violation may be effectively remedied by the state's compliance with the injunctive decree entered by the court in adopting the state's proposed "parallel program" plan for women only at Mary Baldwin.
 
 
 68
 Several important things emerge from those developments. The first is that the remedial plan proposed by the Commonwealth and adopted as remedy by the district court simply involves a new gender-classification which now has become the proper subject of the heightened scrutiny mandated by Craig and its progeny. Cf. White v. Weiser, 412 U.S. 783, 795 (1973) (judicial review of remedial redistricting plan asks only whether plan meets constitutional requirements, not whether it provides best possible remedy for original violation).
 
 
 69
 The next point of importance is that this new gender-classification (in its projected form) is of a type that has not yet been definitively subjected to equal protection scrutiny: it involves a state's provision of separate single-gender educational institutions for men and women which it is claimed will meet equal protection requirements by providing substantially equal, though separately administered, benefits. This could raise a threshold question whether separate state-supported educational facilities for men and women, like those for white and black students, are so "inherently unequal," by reason of their stigmatic implications, see Brown v. Bd. of Educ., 347 U.S. 483, 495 (1954), that the new classification violates equal protection per se and warrants no further scrutiny.
 
 
 70
 If the answer to that threshold question is, however, "no", so that intermediate scrutiny must proceed in detail, a final point of importance about the new classification must be faced. It is that one of the two critical elements in its separate-but-equal arrangement, the women-only program at Mary Baldwin, is only a plan and not a present reality. This creates a difficult problem for Equal Protection analysis. Must we assume, without question, that the stated goals of the women's program are actually achievable and that the fact of their achievement is subject to judicial verification when it occurs, so that we should, on that assumption, (though conditionally) assess the plan in its proposed ultimate form?[1] Or may we, in intermediate scrutiny, question either or both the achievability of the program's stated objectives and the ability of the courts effectively to assess their achievement? If we undertake conditional assessment of the plan on the stated assumption, what is the proper equal protection test for allowable separate-but-equal state-supported educational institutions? What is the proper measure of equality for that purpose?
 
 
 71
 Each of these inescapable problems raises for us issues of first impression in application of equal protection jurisprudence to the resolution of this case.
 
 II
 
 72
 The logical first question is whether separate single-gender undergraduate educational facilities for men and women are "inherently unequal" so that the proposed plan, even if perfectly realized in time, would be per se violative of equal protection. Cf. id. The question has not been addressed by the Supreme Court, see Hogan, 458 U.S. at 720 n. 1, or by this court, hence is an open one. Under the disposition I believe proper, it could remain open, for I would decline to address it, and hold that even if some separate-but-equal arrangement might pass equal protection muster, the one here proposed would not.[2]
 
 III
 
 73
 This leads to the next question: whether the particular separate-but-equal arrangement proposed by the Commonwealth and adopted by the district court can survive intermediate equal protection scrutiny.
 
 
 74
 As earlier noted, the fact that the women-only component of this arrangement exists now only in plan form presents a difficult analytical problem: whether its consummation in fact should be assumed, with scrutiny then confined to the consummated overall plan, or whether the possibility of effective, judicially verifiable consummation of the plan may itself be questioned. Because I believe that even were the VWIL proposal to be substantially consummated in foreseeable time the resulting two-component arrangement would not pass equal protection muster, I would proceed on that assumption, though with some reservations to be expressed about the practical enforceability of the injunctive decree that embodies the proposal.
 
 
 75
 * In its fully consummated form, the Commonwealth's proposed arrangement would consist of two separate single-gender undergraduate institutions, one for men only, the other for women only. The basic structure of each has been accurately summarized in the majority opinion and is not in dispute. A brief recapitulation of the core aspects suffices here.
 
 
 76
 The men-only component would be Virginia Military Institute, a justly famous and distinguished state-supported four-year liberal arts college organized and operated since 1839 in the classic "military school" model, featuring a student body now numbering around 1,300 men organized as a quasi-military "Corps of Cadets" and a distinctive "adversative" social and educational methodology designed to produce a distinctive type of "citizen-soldier" particularly suited for military and civic leadership.
 
 
 77
 The women-only component would be the Virginia Women's Institute for Leadership (VWIL) operated under contract with, and funded by, the Commonwealth of Virginia, as part of the undergraduate program at the otherwise privately-funded Mary Baldwin College. This "Institute," whose essential structure and stated mission are accurately summarized in the majority opinion, ante at 1233-35, would have come into existence in the Fall of 1995 at the earliest, around a century and a half after VMI's founding. While its future enrollment is necessarily uncertain, it would be expected to start up with about 25 to 30 students and expand as a concededly problematic demand for its highly specialized program allowed.
 
 
 78
 As indicated, for purposes of decision here, I would lay aside all concerns about whether the VWIL program would actually ever work out substantially as proposed, assume that it would be, and subject the resulting two-component arrangement to intermediate level equal protection scrutiny. That is, I would ask whether the resulting provision of separate state-supported men-only and women-only educational opportunities at VMI and VWIL respectively could meet that standard.
 
 B
 
 79
 The first step in that process is to identify the precise governmental objective(s) the Commonwealth asserts to be the "important" one(s) justifying the proposed double gender-classification under which women will continue to be denied admission to VMI and men to VWIL. For in intermediate level scrutiny, unlike rational-basis scrutiny, we are limited to consideration of the objectives specifically advanced by the state, and may not look beyond those to any our imaginations might seize upon as justification. See L. Tribe, American Constitutional Law, Sec. 16-32, pp. 1604-06 (2d ed.1988).
 
 
 80
 Though usually the governmental objectives relied upon to justify gender (and other) classifications are plainly enough articulated by their state defenders, that is not so true here. There is a real problem of identification in this case, for the Commonwealth seems uncertainly to advance a number as alternative or cumulative free-standing possibilities. Three might be identified: (1) providing separate single-gender educational facilities for both men and women because of the intrinsic value to some in both genders of such a social environment for education ("intrinsic value");[3] (2) producing both men and women particularly suited for leadership roles as "citizen-soldiers" by providing separate single-gender educational programs for each that are designed to accommodate their different psychological and emotional strengths and weaknesses in becoming effective leaders in either domain ("gender-adapted leadership training");[4] and (3) providing separate single-gender educational facilities for men and women as part of an overall objective of providing a diverse array of state-supported higher-education opportunities ("system-diversity").[5]
 
 
 81
 If these be, alternatively or together, the "governmental objectives" now asserted by the Commonwealth, we are entitled at the outset to inquire as to whether they are the "actual purposes," and to reject them if the record draws their reality as the true motivations for the policy sufficiently in doubt.[6] This was exactly what the Supreme Court did in rejecting the State of Mississippi's assertion in Hogan that its primary objective in maintaining its School of Nursing for women only was to compensate for past discrimination against them. Looking to the history of the School's founding and subsequent operation, to statistics respecting the actual dominance of women in the nursing profession throughout that history, and to state legislative history, the Court concluded that "although the state recited a 'benign, compensatory purpose,' it failed to establish that the alleged objective is the actual purpose underlying the discriminatory classification." Hogan, 458 U.S. at 730. The real purpose behind the original policy and its continuation through history was implicitly recognized by the Hogan court as being simply the carrying through of a "stereotyped view of nursing as an exclusively women's job." Id. at 729. See also Califano v. Goldfarb, 430 U.S. 199, 212-17 (1977); Weinberger v. Wiesenfeld, 420 U.S. 636, 648 (1975) (noting that "the mere recitation of a benign compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme").
 
 
 82
 I believe that a comparable inquiry here could properly support a like rejection of the various governmental objectives suggested by the Commonwealth--on the basis that they demonstrably are rationalizations compelled by the exigencies of this litigation rather than the actual overriding purpose of the proposed separate-but-equal arrangement. Such an inquiry--looking realistically to the historical record, taking judicial notice of much of relevance that is known to the whole world and of which we are not compelled to feign ignorance, see Watts v. Indiana, 338 U.S. 49, 52 (1948), and holding the Commonwealth to its appropriate stringent burden of justification, see Hogan, 458 U.S. at 724 (must be "exceedingly persuasive") would, I believe, reveal a quite different actual purpose. Specifically, I think it would support a confident and fair conclusion that the primary, overriding purpose is not to create a new type of educational opportunity for women, nor to broaden the Commonwealth's educational base for producing a special kind of citizen-soldier leadership, nor to further diversify the Commonwealth's higher education system--though all of these might result serendipitously from the arrangement--but is simply by this means to allow VMI to continue to exclude women in order to preserve its historic character and mission as that is perceived and has been primarily defined in this litigation by VMI and directly affiliated parties.[7]
 
 
 83
 To reach such a conclusion would no more question the good faith of the Commonwealth in advancing these claimed governmental objectives in this litigation than did the Supreme Court's rejection of the objectives advanced by Mississippi in the Hogan litigation. It would simply involve the same realistic recognition that the objectives advanced represent after-the-fact rationalizations that, quite understandably, may be advanced by any state required in litigation to justify a gender-classification whose seeds were planted long before equal protection jurisprudence had come into being or had evolved to the point of drawing it in question. Cf. Cleveland Board of Education v. LaFleur, 414 U.S. 632, 653 (1974) (Powell, J., concurring in result) (urging analysis of mandatory pregnancy leave policy under equal protection doctrine, and rejecting under such an analysis "most of the after-the-fact rationalizations proposed by the [state agency defendant]" as "unsupported by the record").
 
 
 84
 A conclusion that the actual, overriding purpose of the proposed separate-but-equal arrangement remains the preservation by that means of the original 1839 policy of excluding women from VMI, a policy that unquestionably has been driven unchanged since its origins by a stereotyped view of the proper role and capabilities of women in society, would of course require declaring the proposed arrangement violative of equal protection without further inquiry into specifics. See Hogan, 458 U.S. at 729, 730.
 
 
 85
 Although, as indicated, I believe a decision on that ground would be proper, I would not decide the case on that basis alone, or even primarily. There are unique circumstances here that were not present in Hogan or in any other case of which I am aware in which a state's asserted objectives have been rejected at the threshold as demonstrably not the "actual purpose" of a challenged gender-classification. Uniquely, the gender-classification under specific challenge here is one now defended by the Commonwealth as a proposed judicially required remedy for a so-far unsuccessfully defended prior gender-classification. The real position of those who defended the original policy remains that the Commonwealth should not have been required to undertake any remedial action, hence that it need have no justifying objectives for the new remedial gender-classification it proposes. See supra, note 7. Though the Commonwealth does not press the point, I think it fair to recognize that in these circumstances, unlike those where the gender-classification being defended is one prompted entirely by voluntary state action, courts should be especially cautious about rejecting as not "actual" the objectives advanced for involuntarily undertaken remedial action. Accordingly, though I believe the Commonwealth must defend its remedial plan under the usual intermediate scrutiny standard, I think it is entitled to have its proposed separate-but-equal gender-classification assessed for the substantiality of its "fit" to the remedial objectives it now asserts.
 
 C
 
 86
 Assuming then for purposes of this case that the governmental objectives earlier identified should be accepted as reflective of the "actual purposes" of the proposed plan despite my stated doubts about their reality as other than compelled remedial rationalizations, the next question is whether they have also been shown to be "important" and not merely "rational." Here again, because of the conceptual difficulties presented by the remedial context of the case, I would assume arguendo[8] the importance of the governmental objectives asserted by the Commonwealth and proceed to the second inquiry under the proper equal protection test: whether the Commonwealth has made an "exceedingly persuasive" showing that the gender-classification central to its proposed separate-but-equal arrangement is "substantially and directly related to its proposed [remedial] objectives." Hogan, 458 U.S. at 724, 730. I would hold not, as the primary ground for decision that the proposed plan does not pass constitutional muster.
 
 
 87
 What is the "substantial and direct relationship"--the "fit"--between means and asserted ends for which we search in intermediate scrutiny, and how do we look for it--in general, and particularly in this case? The general question whether a challenged classification "is substantially related to its asserted goals" has been characterized as "at best an opaque one." Michael M. v. Superior Court of Sonoma County, 450 U.S. 464, 474, n. 10 (1981) (plurality opinion) (emphasis in original). Though as this rightly observes, the substantive inquiry is likely to be difficult, two critical aspects of the inquiry process are plain enough.
 
 
 88
 1. The inquiry is one of law--of constitutional law--so that review of a lower court's determination of the issue, (though not of any underlying factual predicates) is plenary. See, e.g., Wengler v. Druggists Mutual Ins. Co., 446 U.S. 142, 150-52 (1980) (plenary review of State Supreme Court holding).
 
 
 89
 2. The requirement that the relationship between discriminatory means and asserted goals be "substantial and direct," rather than merely "rational for any conceivable purpose," mandates an inquiry into available alternatives, including gender-neutral ones. This is not to determine whether the fit is the best one possible, but to ensure that the means chosen did not by-pass reasonably available alternatives less discriminatory or not at all discriminatory in their impact on the disfavored gender. See, e.g., Wengler, 446 U.S. 142, 151 (1980); Orr v. Orr, 440 U.S. 268, 283 (1979).
 
 
 90
 The specific issue thus becomes whether the Commonwealth has sufficiently shown within these principles, that its proposed separate single-gender school arrangement is directly and substantially related to the achievement of the three governmental objectives earlier identified in short-form as the "intrinsic value," "gender-adapted leadership training," and "system-diversity" objectives. Supra at 1246.
 
 
 91
 As earlier indicated, the question of the fitness of any such separate single-gender school arrangement to achieve any governmental objective apparently is one of first impression in contemporary equal protection jurisprudence. One aspect of the matter, however, seems clear at the outset to me: no such arrangement could be found substantially related to any conceivable governmental objective unless the benefits to be separately distributed by the arrangement were substantially equal across the board of the relevant criteria for evaluating educational institutions. The Supreme Court's reference, in dicta, to the possibility of such an arrangement in Hogan seems to assume such an equality of benefits as a given, see Hogan, 458 U.S. at 720 n. 1, and I do not see how it could be otherwise under contemporary equal protection jurisprudence. Certainly, when separate-but-equal educational arrangements for the races were considered to be tolerable under the Equal Protection Clause, a basic prerequisite was that they be truly, substantially equal in all the relevant criteria, tangible and intangible, by which educational institutions are evaluated. See e.g., Sweatt v. Painter, 339 U.S. 629, 633-34 (1950) (requiring "substantial equality in educational opportunities" to justify separate state-supported law schools for white and black students, and not finding it upon considering both tangible resources such as "scope of library" and intangible resources such as "position and influence of the alumni," "traditions and prestige"). Though race is a "suspect" classification and gender so far is not, I see no reason why the same requirement of substantial equality of benefits that was thought at one time to justify separate-but-equal schools for the different races should not apply to separate schools for men and women if that classification now does, as race formerly but no longer does, permit separate-but-equal arrangements. If that be so, then no governmental objective whose achievement is specifically dependent upon the utilization of separate single-gender institutions to distribute educational benefits could possibly justify a significant discrimination between the two in terms of the basic content, or quality, or quantity of those benefits--tangible and intangible. Thus, I would think a state could not justify under intermediate scrutiny the provision of a men-only engineering school and a women-only nursing school as a means of achieving such asserted objectives as system-diversity, or the intrinsic value to some in each gender of single-gender educational environments, or the like. Neither could it justify the provision of separate graduate or undergraduate institutions having comparable educational programs and missions, but also having wide disparities favoring one gender over the other in matters of physical plant, annual funding, faculty or like commonly understood measures of value.
 
 
 92
 Does this mean that there is no way that a state constitutionally could set about achieving such governmental objectives through the provision of separate single-gender institutions? I think it does not necessarily mean that, but the arguably acceptable means would seem to me to be very narrowly circumscribed. If we looked for the arrangement most likely to survive scrutiny, it presumably would involve simultaneously opened single-gender undergraduate institutions having substantially comparable curricular and extra-curricular programs, funding, physical plant, administration and support services, and faculty and library resources. Such an arrangement would involve no gender-line discrimination in terms of tangible benefits, nor of intangible benefits such as tradition, prestige and alumni influence--as to which each starts with none. Nor could there be any stigmatic implications arising from the substantially comparable content of its educational program. If any arrangement involving separate-but-equal single-gender institutions set in place to achieve governmental objectives of system-diversity, or of accommodating valid preferences in each gender for a single-gender educational environment, could survive equal protection scrutiny, it surely would be one such as that posited.
 
 
 93
 Taking it as the paradigm against which to measure the proposed arrangement reveals how far short the proposed plan falls from providing substantially equal tangible and intangible educational benefits to men and women. Without denigrating in any way the proposed VWIL program, nor certainly Mary Baldwin, the contrast between the two on all the relevant tangible and intangible criteria is so palpable as not to require detailed recitation. If every good thing projected for the VWIL program is realized in reasonably foreseeable time, it will necessarily be then but a pale shadow of VMI in terms of the great bulk, if not all of those criteria. Particularly is this obvious with respect to the intangibles such as prestige, tradition and alumni influence which the Supreme Court, looking for substantial equality of educational opportunities in Sweatt, thought "more important" even than tangible resources. 339 U.S. at 634. The student and eventual graduate of VWIL will not be able to call on the prestigious name of "VMI" in seeking employment or preference in her various endeavors; the powerful political and economic ties of the VMI alumni network cannot be expected to open for her; the prestige and tradition of her own fledgling institution cannot possibly ever achieve even rough parity with those of VMI. The catch-up game is an impossible one, as any honest reflection upon the matter must reveal.
 
 
 94
 The district court and the majority apparently seek to avoid the insurmountable problem of finding substantial equality of benefits by narrowly defining the relevant range of those to be considered. If inquiry is confined only to those benefits sought by those relatively few women who are expected to self-select VWIL primarily for its single-gender environment, it becomes very easy to ascribe not only substantial equality, but superiority, to the benefits available at VWIL. But that, of course, won't do. The proper perspective from which to measure substantial equality of available benefits is that of the potential student who could be admitted to either school and has a choice. As was said in Sweatt, "[i]t is difficult to believe that one who had a free choice between [these] schools would consider the question close." Id.
 
 
 95
 The implication of all this is, as I realize, a stark one. No separate single-gender arrangement that involved VMI as the all-mens' school and any newly-founded separate institution (whether free-standing or an appendage) as the all womens' component could pass equal protection muster. It could not provide substantially equal educational benefits or opportunities to both genders.
 
 
 96
 This may be most obvious when the proposed arrangement is tested for fit against the "system-diversity" and "intrinsic value" objectives. The "gender-adopted leadership training" objective poses a slightly different problem. The benefit upon which it concentrates is a projected outcome: that of being one especially suited for military and civilian leadership by virtue of training adapted to different gender-characteristics, as "citizen-soldier."As to this particular objective, I will close by noting a process reservation beyond the substantive concerns for achieving substantial equality of the outcome goal. It seems to me too amorphous an objective to permit any principled judicial assessment as the VWIL program is expected to evolve. When can it first be assessed? Surely not earlier than the four years it will take to produce the first graduate presumably trained for that special leadership role. Must it not actually await an additional period for putting the training to test in the military and civilian domains? How will it be assessed even then: by comparing, on a proportional basis, the actual leadership positions achieved by graduates of the two schools? My pessimistic assessment is that one of two things will occur. One, this particular governmental objective--actually a critical one as advanced--will simply be allowed to fall out of sight in the judicial monitoring of results that is projected. Two, its attempted monitoring will generate an absolute quagmire of conflicting contentions about achievement of the objective.
 
 
 97
 It will not work.
 
 
 
 *
 The dissenting opinion has improperly characterized this test as one for "allowable separate-but-equal state-supported educational institutions." This misunderstands the standard we utilize
 As a general principle of equal protection jurisprudence, when there is no meaningful and relevant difference between two classes of persons for purposes of a given state regulation, equality is demanded, and "separate but equal" does not fulfill the demand. When there is a difference between two classes of persons, then separate and different facilities for each class may satisfy equal protection if the difference in facilities is sufficiently related to the nature of the difference between the classes.
 In this case, we do not espouse a "separate-but-equal" test and never discuss "separate-but-equal facilities." Rather, the test we utilize would allow separate and substantively comparable facilities where a state justifies its offering of single gender education as a legitimate governmental objective.
 
 
 [1]
 The district court necessarily made that assumption. Implicit in its decision is the determination that (1) if the asserted objectives of the women-only program at Mary Baldwin are achieved, the result will be a separate-but-equal provision of benefits that passes equal protection muster and (2) achievement of the objectives is a realistic possibility capable of verification by the court when it occurs
 
 
 [2]
 The United States has expressly disclaimed any contention that any and all forms of state-supported single-gender education are per se violative of equal protection. See VMI I, 976 F.2d at 898. This position would seem compelled by the Supreme Court's recognition in Hogan that a single-gender educational institution might be justified on the basis of need to compensate the favored gender for past discrimination. 458 U.S. at 727, 728. But that is a different issue than the issue whether the provision of allegedly separate-but-equal single-gender facilities for purposes other than compensation for past discrimination against one of the genders would violate equal protection per se because--as in matters of race--such separateness is "inherently unequal." The "question whether states can provide 'separate but equal' undergraduate institutions for males and females" was, in fact, expressly noted by the Supreme Court in Hogan as still an open one. Hogan, 458 U.S. at 720 n. 1. I do not therefore understand the United States' disclaimer to run as well to noncompensatory "separate but equal" arrangements, particularly in view of its suggestion of their necessary stigmatic implication. Appellant's Br. 20-22; Reply Br. 9, 10. For this reason, I do not think the issue whether non-compensatory "separate but equal" arrangements are per se violative can be avoided as waived, but, as indicated, would myself avoid it as unnecessary to decision in this case
 
 
 [3]
 Appellees' Br. at 4, 5
 
 
 [4]
 Id. at 2-4, 32-37
 
 
 [5]
 Id. at 14 & n. 5
 
 
 [6]
 Such an inquiry logically precedes inquiry into the "importance" of any objectives accepted as reflective of "actual purpose." See Hogan, 458 U.S. at 730. As to how the "importance" inquiry would work out in this case, see infra, at 1248 & n. 8
 
 
 [7]
 As the record indicates, and as it is well to recall at this stage of the litigation, the Commonwealth of Virginia did not officially defend the original VMI men-only policy that we held to be unconstitutional in VMI I. The justification for that policy advanced in VMI I was exclusively shaped and actively conducted by VMI, its official governing board, that board's members and (as intervenors) VMI alumni organizations. See VMI I, 976 F.2d at 894 & n. 3. The justification then advanced by those parties is fairly and simply summarized:
 VMI's distinctive educational program, featuring rigorous military discipline and an "adversative" methodology, is suitable only for men and not for women, to the point that the admission of any women into it would effectively destroy it; the demonstrated value to society of that program and those it has produced is too important to allow it to be destroyed in that way.
 See VMI I, 976 F.2d at 896-97.
 That justification and the perception underlying it has not been abandoned by those who advanced it. They continue to press it by "protective" cross-appeal on this appeal after having sought to challenge its rejection in the Supreme Court.
 Taking judicial notice of matters surely of common knowledge in the Commonwealth, I would be prepared to conclude that (1) the perception underlying the policy justification advanced by VMI officials and alumni organizations remains alive and strongly held by those parties, and that (2) the prestige and influence of VMI and its justly loyal alumni and their organization in influencing any political decision affecting VMI's interests is sufficiently powerful to ensure that their overriding purpose in this matter effectively defines the actual governmental objective of the Commonwealth's proposed remedial plan. That overriding purpose remains the preservation of VMI as a state-supported educational institution for men only, with all other asserted purposes of the plan merely secondary means to that end.
 
 
 [8]
 I make the assumption arguendo because resolution of the special conceptual problems respecting remedial objectives in intermediate-level scrutiny that would be required is not necessary to the decision I would reach. In making the assumption, I note, with all respect, that I do not agree with the majority's assertion that when we do assess "importance" we owe great deference to legislative judgments on the matter. I believe instead that in intermediate scrutiny the state's burden of showing the "importance" of asserted objectives is, as with all aspects of its justification defense, a difficult one that provokes non-deferential judicial balancing of the objectives asserted against affected private interests. See, e.g., Craig, 429 U.S. 190, 196 (1976) (asserted governmental objective of administrative convenience not sufficiently "important" to justify gender-classification being challenged; no deference accorded legislative judgment)